# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0629-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.A.W.,

     Defendant-Appellant,

and

T.L. and B.T.,

     Defendants.

_____

IN THE MATTER OF T.T.
and T.L., minors,

_____

Submitted November 30, 2020 – Decided June 1, 2021

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0054-15.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Patricia Nichols, Assistant Deputy Public Defender, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant A.A.W.[1] appeals from two orders of the Family Part relating to the custody of her two children, T.T. and T.L.: (1) the November 27, 2018 order combining applications for legal custody of the children by two caregivers with an application for legal custody of the children by plaintiff Division of Child Protection and Permanency (DCPP or the Division); and (2) the August 27, 2019 order transferring physical custody of the children to the caregivers, sharing

---

[1] We identify defendant, her children, and the other parties by initials to protect confidential information in the record. R. 1:38-3(d)(12).

legal custody between the caregivers and A.A.W., and terminating the Division's action. Incorporated in her appeal is A.A.W.'s challenge to the trial court's May 24, 2019 findings, which were not reduced to an order but served as a predicate to the August 27, 2019 order, that the caregivers are the psychological parents of the children for purposes of determining custody. We affirm.

I.

The following facts are derived from the record. A.A.W. was involved with the Division as a minor until she aged out of eligibility for services. She gave birth to T.T. in 2012 and to T.L. in 2014.[2] Shortly after T.L. was born, DCPP received a referral questioning A.A.W.'s ability to care for her children.

DCPP investigators met with A.A.W. at the hospital. She said she was homeless and residing in a hotel provided by the county board of social services. A.A.W. acknowledged she had been diagnosed with bipolar disorder and schizophrenia, for which she was prescribed medication. She reported, however, that she stopped taking the medication and going to therapy. While A.A.W. conceded she had engaged in self-harm through cutting, she disputes the Division's claim that she admitted to the investigators that she cut herself as recently as a month prior to giving birth to T.L. A.A.W. told investigators T.T.

---

[2] The fathers of the children have not filed an appeal of the trial court's orders.

A-0629-19

had been living with her maternal grandmother in Georgia, but would be returning to New Jersey soon. A few days after T.L. was born, A.A.W. placed him with K.L., his paternal grandfather, with whom he has effectively lived ever since.

On July 21, 2014, DCPP filed a complaint under N.J.S.A. 30:4C-12 seeking care and supervision of T.T. and T.L. (the Title 30 litigation). After a hearing, the court granted the Division temporary custody because of concerns about A.A.W.'s ability to care for the children. Of particular concern was A.A.W.'s failure to comply with mental health recommendations.

On August 12, 2014, after a hearing, the court continued custody and supervision of the children with the Division. T.L. remained in the physical custody of K.L. and, the court ordered T.T. to remain in the physical custody of her maternal grandmother. A.A.W. was awarded "open and liberal" visitation.

At a subsequent hearing, the court returned physical custody of T.L. to A.A.W. By February 2015, however, because of her unstable housing A.A.W. had returned T.L. to the physical custody of K.L. In addition, A.A.W. had, without court approval, traveled to Georgia to pick up T.T. and bring her back to New Jersey. She placed T.T. with M.H., the former girlfriend of A.A.W.'s

father.  The court awarded physical custody of T.L. to K.L. and physical custody of T.T. to M.H.  A.A.W. had shared legal custody and unsupervised visitation.

In a series of hearings over the following months, the court monitored A.A.W.'s progress and explored relatives identified by A.A.W. as possible people with whom she could live with the children.  Although A.A.W. was sometimes in compliance with court-ordered services, she by and large failed to comply with mental health treatment and her medication regime.  She also did not secure suitable housing.  The court continued the children in the care and supervision of the Division with physical custody with M.H. and K.L. and legal custody shared with A.A.W., who had liberal visitation rights.

A summary hearing was held on August 18, 2015.  A.A.W. requested physical custody of the children so she could move to Georgia to reside with her mother.  The fathers of the children objected to them leaving the State.  Over A.A.W.'s objection, the court continued jurisdiction because A.A.W. had not established compliance with mental health services and suitable housing.

On September 15, 2015, A.A.W. was arrested and detained on gun and drug charges.  Initially, she refused to be evaluated by medical personnel at the jail, which prevented her from obtaining medication.  A.A.W.'s placement in solitary confinement as a result of disciplinary infractions further inhibited her

A-0629-19

mental health treatment.  Ultimately, A.A.W. was prescribed medication for her mental health conditions.  While at the jail, A.A.W. reported a history of sexual abuse, suicidal ideation, self-mutilation, violent thoughts and behaviors, and fire setting.  She previously acknowledged having hallucinations and hearing voices when not on her medication.

After an October 2015 hearing, the court continued the custody arrangement, directed the Division to provide services to A.A.W. when she was released from jail, and ordered M.H. and K.L. to arrange for A.A.W. to visit her children at the facility at which she was housed.  The court held several hearings during A.A.W.'s incarceration to monitor her progress, and to facilitate her visitation with the children and sibling visitation.

After A.A.W.'s release, the Division requested a best interest hearing to determine the final disposition of the children, as there had been no change in the status of the case, no recent contact with A.A.W., and no compliance with services by A.A.W.  A.A.W.'s counsel and the law guardian representing the children consented to the hearing.  The trial court determined that it would be appropriate to end the Title 30 litigation, as A.A.W. had not made progress with services and the children had been with their caregivers for years.

Over a period of more than a year, the court held additional hearings at which it took testimony with respect to the best interest of the children and monitored A.A.W.'s compliance with services. Each time, the court continued the custody arrangement with M.H. and K.L. A.A.W. visited her children infrequently.

Ultimately, the Division requested the court allow M.H. and K.L. to file non-dissolution complaints seeking custody of the children. The law guardian supported that request. The trial court, over A.A.W.'s objection, ordered the opening of a non-dissolution matter for each of the caregivers to determine the children's custody (the FD matters).

On April 23, 2018, A.A.W. was arrested and charged with three drug-related offenses. At a hearing on the Title 30 litigation, the court ordered A.A.W. to comply with a substance abuse assessment. At the time, she tested positive for marijuana. She subsequently failed to appear for eight appointments for the assessment.

On November 27, 2018, the trial court, relying on our holding in N.J. Div. of Youth & Family Servs. v. S.D., 453 N.J. Super. 511 (App. Div. 2018), found that the Title 30 litigation and the FD matters were "intricately intertwined" and should be heard together. The court determined a hearing would be held

A-0629-19

pursuant to <u>Watkins v. Nelson</u>, 163 N.J. 235 (2000), to determine if there was clear and convincing evidence that A.A.W. was unfit as a parent or that there were other exceptional circumstances, such as that the caretakers were the psychological parents of the children. If so, the court would hold a best interest hearing to determine custody. All parties agreed to this two-step process. The court also continued the custody arrangement with M.H. and K.L.

Over three days, the court heard testimony from a Division caseworker, an expert in psychology as it relates to parent/child bonding, M.H., and K.L. On May 24, 2019, the court issued a comprehensive written opinion concluding that under the four-prong test set forth in <u>V.C. v. M.J.B.</u>, 163 N.J. 200, 223-24 (2000), clear and convincing evidence established that M.H. was the psychological parent of T.T. and K.L. was the psychological parent of T.L.

The court found that A.A.W. voluntarily placed her children with their respective caregivers and that T.T. had lived with M.H. for more than four years and T.L. had lived with K.L. for five years. During that time, the court found, M.H. and K.L. provided all of the day-to-day care of the children, at their own expense, with almost non-existent financial or other support from A.A.W. They provided all of the education and medical support needed by the children, including interacting with their schools to facilitate individual educational plans

8

addressing the children's special needs, and scheduling medical and dental appointments. In addition, the court found that the caregivers facilitated visits between A.A.W. and the children, although stymied in their efforts by A.A.W.'s lack of interest and follow through. In addition, the caregivers facilitated visits between the siblings.

The court also accepted the "undisputed expert testimony" that, despite T.T.'s ambivalence about her mother, M.H. is the child's psychological parent. The court found that T.T. has "a good and solid bond with [M.H.]" and would be "irreparably psychologically harmed if she were removed from" her custody, having lived with her for more than half of her life.

The court also accepted the "undisputed expert testimony" that K.L. is the "full psychological parent of [T.L.,]" that the two have "a secure bond" and "a relationship that was like a father and son." In addition, the court adopted the expert's opinion that T.L., who lived with K.L. for effectively his entire life, "would be irreparably psychologically harmed if removed from" K.L. and would "likely experience a massive regression in social and cognitive development if separated."

The court noted the absence of a comparative analysis by the expert of the bond between A.A.W. and the children. However, the court determined that

such an analysis was unnecessary, as the question before the court was the bond between the children and their caregivers.

The court subsequently held a three-day best interest hearing to determine custody of the children. The court heard testimony from a Division caseworker, K.L., A.A.W., and her sister. A.A.W. requested physical custody of the children so she could move with them to Georgia, where she would live with her sister. She expressed her willingness to allow the children to have periodic visits with the caregivers. M.H. and K.L. proposed maintaining the current arrangement.[3]

On August 27, 2019, the court issued a comprehensive written opinion analyzing the factors set forth in N.J.S.A. 9:2-4(c). Given its prior decision, the court treated M.H. and K.L. as psychological parents in parity with A.A.W. The court found that A.A.W. lacked credibility as a witness and "that, while doing very little for her children, she often blames others for how uninvolved she has been and for how little she has seen her children." In addition, the court found A.A.W. lacked credibility with respect to her claims to be compliant with mental

---

[3] The Division's background check on A.A.W.'s mother revealed that she had previously been substantiated by the agency for physical abuse and neglect of children. The Division could not, therefore, approve to live with A.A.W.'s children. Initially, the Division could not approve A.A.W.'s sister because she lived with A.A.W.'s mother. A.A.W. later failed to prove her claim that she and her sister had signed a lease to a home in Georgia at which they would reside without their mother.

health treatment, having produced no evidence to corroborate her testimony. With respect to A.A.W.'s long delay in submitting to a court-ordered substance abuse evaluation, the court found that she "is lying to the court or is simply incapable of complying with court orders."

The court also rejected A.A.W.'s claims to have purchased clothes and other items for her children while they were in the physical custody of M.H. and K.L., finding her testimony to be unsupported by corroborating evidence and contradicted by the children's caregivers. The court concluded that A.A.W.'s infrequent visitation with the children was not consistent with a parent seeking to regain physical custody.

Relying on the evidence adduced at the Watkins hearing, as well as the evidence admitted at the custody hearing, the court determined that M.H. and K.L. were stable and reliable parental figures for T.T. and T.L., respectively. The court found the caregivers had adequately provided for the care, housing, and education of the children and intended to continue to do so. A.A.W., on the other hand, had not meaningfully supported her children for several years.

With respect to A.A.W.'s plan to move the children to Georgia, the court found that she provided no details on when she would move, where she and the children would live in the interim, and how the transition would take place. In

11

addition, the court found that A.A.W. did not know the address of the house in Georgia in which she proposed to live, and offered no plan for her receipt of mental health treatment and medication in Georgia. The court concluded that A.A.W. asked it "to weigh the certainty of the observed and assessed plan that currently exists for [T.T. and T.L.] against the uncertainty of [her] vague and nonspecific plan for the children's care in Georgia." The court also found that based on credible expert testimony, the children would suffer serious and ongoing psychological harm if separated from their caregivers and A.A.W. had no plan on how she would mitigate that harm.

Based on these findings, the court concluded that

> by a preponderance of the evidence . . . it is clearly, if not overwhelmingly, in the best interests of [T.T. and T.L.] to remain primarily in the care of their current caregivers, with whom they have developed and matured throughout the majority of each of their lives and with whom they each have a bond akin to that of a parent and child.

The court, therefore, granted the FD applications of M.H. and K.L., giving each sole physical custody of the child for whom they had been serving as caregiver. The court awarded A.A.W. joint legal custody to each of her children with their respective caregiver. The court concluded that this "arrangement guarantees that the children can remain in their current schools, with no disruption to the

12

continuity of their education, their daily lives, and their relationships with their caregivers." The court also directed M.H. and K.L. to agree upon a sibling visitation schedule for the children.

The court rejected A.A.W.'s argument that another plenary hearing was necessary to establish A.A.W.'s parenting time. Relying on the evidence admitted in the prior hearings, the court concluded it was in the best interest of the children for A.A.W. to have weekly supervised visitation. The court permitted M.H. and K.L. to approve of any additional visitation. The court concluded that supervised visitation was necessary because A.A.W. had not established her compliance with mental health treatment and medications. The court ordered that after four successful visits and upon proof of compliance with mental health recommendations, A.A.W. may apply in the FD matters for unsupervised parenting time with her children.

Finally, the court terminated the Title 30 litigation, "as the children are currently safe with their caregivers and the FD dockets provide [A.A.W.] accessible avenues of relief to modify parenting time, or even to seek custody." The court rejected the argument that an additional hearing was needed in the Title 30 litigation to address A.A.W.'s ongoing mental health services. An August 27, 2019 order memorializes the court's decision.

A-0629-19

This appeal followed. A.A.W. raises the following arguments.

> POINT I
>
> DUE PROCESS VIOLATIONS AND ERRORS IN THE EXERCISE OF CARE AND SUPERVISION, OVER A FAMILY WHOSE ONLY NEED WAS HOUSING, RESULTED IN A JUDGMENT THAT MUST BE REVERSED.
>
> POINT II
>
> BECAUSE THE PSYCHOLOGICAL PARENTAGE OF THE TEMPORARY CAREGIVERS WAS ADJUDICATED UNDER INCORRECT OR MISAPPLIED STANDARDS, THE JUDGMENT OF THE TRIAL COURT HERE ON APPEAL MUST BE REVERSED.
>
> POINT III
>
> BECAUSE THE FORCED CHANGE OF CUSTODY TO THIRD PARTIES WAS NOT A PROPER ADJUDICATION OF THIS MATTER AND NEITHER THE CUSTODY ORDER NOR THE VISITATION ORDER WERE PROPERLY DECIDED THE JUDGMENT OF THE TRIAL COURT HERE ON APPEAL MUST BE REVERSED.

The law guardian supports the trial court's orders.

II.

We defer to Family Part judges' fact-finding because of their "special jurisdiction and expertise in family matters," Cesare v. Cesare, 154 N.J. 394, 413 (1998), their "opportunity to make first-hand credibility judgments about

the witnesses who appear on the stand[,] [and their] feel of the case that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 101 (2006)). Fact-finding that is supported by "substantial credible evidence in the record" is upheld. N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010). However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of No. Amer., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

### III.

We begin with A.A.W.'s challenge to the court's November 27, 2018 order combining the Title 30 litigation with the caregivers' FD matters. Title 30 of our statutes authorizes court intervention when necessary to "ensure the health and safety of the child." N.J.S.A. 30:4C-12. Under Title 30, the Division, with court oversight, may be ordered to provide services to children who may not have been abused or neglected but whose parents seem unfit or "are unable to provide a safe and healthy environment for the child." N.J. Div. of Youth & Family Servs v. I.S., 214 N.J. 8, 36-37 (2013).

15

In the FD matters, M.H. and K.L. sought full physical custody of T.T. and T.L. To determine custody, the court must make fact finding relating to the ability of the parties seeking custody to provide for the care of the children and apply those facts to the factors set forth in N.J.S.A. 9:2-4(c). Ultimately, the court must determine custody based on the best interests of the children.

The issues to be decided in the Title 30 litigation and the FD matters, therefore, overlapped. We addressed similar circumstances in S.D. There, the court had before it both a Title 9 complaint alleging abuse and neglect of a child (FN matter) and subsequently filed FD applications for custody of the child by her grandmothers. We approved a joint hearing for the disposition of the three matters:

> It would have been appropriate for the court to have held a joint FN dispositional and FD custody hearing at which defendant was afforded counsel. Or, the FD filings by the grandmothers could have been considered part of the FN litigation without the additional FD designation. The FD custody hearing was an integral part of the [FN] litigation.
>
> [S.D., 453 N.J. Super. at 523 (footnote omitted).]

We noted the benefit to a parent of combining the complaints, given that the right to appointed counsel in an FN matter:

> The court's technical designation of a hearing as FD or FN should not hamper the court's mission to safeguard

16

the welfare of children. When unusual procedures are undertaken, however, it is crucial to ensure that the parents are represented by counsel. Counsel are statutorily appointed for indigent parents only in Children in Court cases. Designating a hearing as a combination FD/FN hearing would ensure the participation of defense counsel and the Law Guardian . . . .

[Id. at 525 (footnote and citations omitted).]

The trial court followed this prudent course. By combining the Title 30 litigation with the FD matters, the court avoided duplicate hearings on overlapping issues, and protected A.A.W.'s interests, given that her appointed counsel in the Title 30 litigation represented her at the joint hearing. Our review of the record reveals no deprivation of A.A.W.'s due process rights as a result of the combined proceedings.

IV.

We also reject A.A.W.'s argument that the trial court erred when it found that M.H. and K.L. are the psychological parents of T.T. and T.L., respectively. To establish that a third party is a psychological parent, the court must find: (1) the legal parent consented to and fostered the parent-like relationship between the party and the child; (2) the party lived with the child; (3) the party performed "significant" parental functions for the child, such as responsibility for the child's care, education, and development, without expectation of financial

17

compensation; and (4) "most important" that "a parent-child bond [was] forged." V.C., 163 N.J. 200 at 223-24. Each prong is critical because "[a]t the heart of the psychological parent cases is a recognition that children have a strong interest in maintaining the ties that connect them to adults who love and provide for them." Id. at 221.

Having carefully reviewed the record in light of this precedent, we affirm the trial court's May 24, 2019 findings regarding the status of K.H. and M.L. as psychological parents for the reasons set forth in Judge Bruce J. Kaplan's thorough and well-reasoned written opinion. We add only the following limited comments. It cannot reasonably be disputed that A.A.W. voluntarily placed her children with M.H. and K.L. She also does not challenge the court's conclusion that prongs (2) and (3) of the V.C. test were met. Expert testimony, which was subject to cross-examination by A.A.W.'s counsel, unequivocally supports the trial court's conclusion that the children forged strong bonds with M.H. and K.L. over several years and formed relationships akin to that of parent and child. A.A.W. did not present an expert witness offering a contrary opinion.

We see no basis to reverse the trial court's determination that the fourth prong of V.C. had been established based on what it found to be credible expert

A-0629-19

testimony. The court, therefore, correctly put M.H. and K.L. on equal footing with A.A.W. when it undertook the best interest analysis to determine custody.

V.

We also see no basis to reverse the trial court's custody determination. New Jersey has a strong public policy in favor of ensuring permanency for children. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007). Children have rights independent of their parents' rights, including the right to a "permanent, safe and stable placement." Ibid. Once a court determines that a party seeking custody is the psychological parent of a child, the court must determine whether awarding custody to the third party over a parent is in the best interest of the child. Watkins, 163 N.J. at 253-54.

N.J.S.A. 9:2-4(c) establishes the factors to be considered by a court when determining custody:

> the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity

of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.

We affirm the August 27, 2019 order for the reasons stated in Judge Kaplan's thorough and well-reasoned written opinion. In his August 27, 2019 opinion, the judge comprehensively discusses each of the statutory factors, applies his detailed fact-findings to those provisions, and thoroughly explains his conclusion that it is in the best interests of the children to remain with the caregivers. Recognizing the value of the then longstanding custody arrangement to the children's well-being, the court gave A.A.W. supervised visitation with the children, and left open the ability for A.A.W. to seek unsupervised visitation and custody in the FD matters when she can demonstrate compliance with mental health treatment and an ability to provide suitable and stable housing.

VI.

Nor do we see an error in the trial court's August 27, 2019 order dismissing the Title 30 litigation. Title 30 oversight is intended to be temporary to protect the child's health and safety. Ibid. A court order entered pursuant to Title 30 is effective for only six months. N.J.S.A. 30:4C-12. The court may, at its discretion, extend the order if it is satisfied, by a preponderance of the credible

evidence, that it is in the best interest of the child to do so.  N.J.S.A. 30:4C-12; I.S., 214 N.J. at 37.

Here, over a period of years, the trial court periodically addressed A.A.W.'s mental health, housing, and other needs.  There is no support in the record for A.A.W.'s claim that she was denied full custody of her children only because of a need for housing.  While it is true that A.A.W. failed to secure suitable housing for T.T. and T.L., she also did not consistently comply with recommended treatment for her serious mental health conditions.  A.A.W.'s failure to comply with mental health treatment and her persistent refusal to take her prescribed medication were consistent themes underlying the court's decisions at hearings that took place with A.A.W.'s participation over a period of years.  In addition, for a year after her April 2018 arrest on drug charges, A.A.W. refused to submit to a substance abuse assessment, raising additional concerns about her suitability to have physical custody of her children.

Nor does the record support A.A.W.'s argument that her failure to secure suitable housing was caused by economic issues.  The Division attempted to obtain housing for A.A.W., who refused to move to one apartment at which she had been accepted as a tenant, failed to keep the agency apprised of where she

21

was living, and refused to provide information necessary to give her a security deposit.

We do not agree with A.A.W.'s argument that she was denied due process because no permanency hearings were held and notices of placement were not filed for the children. Permanency hearings and notices of placement are required only for children who are in placement outside the home. N.J.S.A. 30:4C-55; N.J.S.A. 30:4C-61.2. A "[c]hild placed outside his home" is defined as:

> a child under the care, custody or guardianship of the division who resides in a resource family home, group home, residential treatment facility, shelter for the care of abused or neglected children or juveniles considered as juvenile-family crisis cases, or independent living arrangement operated by or approved for payment by the division, or a child who has been placed by the division in the home of a person who is not related to the child and does not receive any payment for the care of the child from the division, or a child placed by the court in juvenile-family crisis cases . . . , but does not include a child placed by the court in the home of a person related to the child who does not receive any payment from the division for the care of the child . . . .
>
> [N.J.S.A. 30:4C:-52(b).]

T.T. and T.L. do not meet this definition. A.A.W. has joint legal custody of the children. She made arrangements for their care independently and decided

22

to place them with M.H. and K.L.  Because T.T. and T.L. were not in placement, the court was not required to hold a permanency hearing and the Division did not need to file notices of placement for them.

To the extent we have not specifically addressed any of A.A.W.'s remaining claims, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION